Mrs. W. W. TURNEY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

W. W. TURNEY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 65257, 65258. Promulgated October 12, 1934.

*Nelson Phillips, Sr., Esq.*, and *Nelson Phillips, Jr., Esq.*, for the petitioners.

*P. A. Bayer, Esq.*, and *R. B. Cannon, Esq.*, for the respondent.

310

OPINION.

ADAMS: Under the constitution and laws of the State of Texas the public lands of the state were appropriated and dedicated to the public free schools, to counties, to asylums, and to the State University and its branches. The state had the right to sell these lands and cover the proceeds into the permanent school fund established for educational purposes.

In the sale of these lands the state inaugurated a system of classification of the lands into grazing and mineral lands. When lands classified as grazing lands were sold there was no reservation of any interest by the state. In the sale of lands classified as mineral lands the state reserved to itself the minerals and oils beneath the surface and the purchaser obtained only the surface rights. As the state or its vendee or lessee of the mineral rights had an easement of going upon the land for the purpose of prospecting and producing oil or other minerals and to use the land, timber, and water necessary therefor, this caused great hardship, damage, and dissatisfaction to the owners of mineral classified lands.

This condition led to the passage by the Texas Legislature in 1919 of an act known as the Relinquishment Act, under which the landowner was constituted the agent of the state to dispose of these mineral rights. Under this act, as construed by the Supreme Court of Texas, the landowner and the state were each entitled to receive a one-sixteenth royalty, and the state was to receive a minimum of 10 cents per acre per annum. Any additional sums by way of increased rentals or bonuses were to be equally divided between the state and the landowner.

The Relinquishment Act was construed and held constitutional by the Supreme Court of Texas in the case of *Greene* v. *Robison,* 117 Texas 516, 8 S.W. (2d) 655, where the court said in part:

> We think the act, as it says in article 5367, creates the owner of the soil the state's agent for the purposes mentioned therein. For the accomplishment of those purposes, said agent is authorized, " to sell or lease * * * the oil and gas * * * upon such terms and conditions as such owner may deem best, subject only to the provisions " of the act. There is no vesting of title or interest in the oil and gas in the owner of the soil. No rights pass to any one until a sale or lease is effected according to the terms of the act. What is sold, the consideration therefor, the provisions inuring to the benefit of the owner of the soil, what are the proceeds of the sale, and their application, must all be determined from the act.
>
> * * * * * * *
>
> We interpret the act to fix a minimum price of 10 cents per acre per annum and the value of one-sixteenth of the gross production free of cost to the state, for which the state is willing to sell the oil and gas, and the agent is authorized to secure the highest price obtainable for the benefit of the fund to which the land belongs; like amounts received by the state to be paid by the purchaser to the owner of the soil. If a bonus is paid, if a larger royalty or other amounts are contracted for, the state and the owner of the soil receive equally in like amounts.

To the same effect is the case of *Empire Gas & Fuel Co.* v. *State* (Civ. App.), 21 S. W. (2d) 376; *idem* (Sup. Ct.), 121 Tex. 138; 47 S. W. (2d) 265.

During the year 1929 petitioner W. W. Turney was a member of a partnership known as the O–2 Ranch, owning a 90 percent interest therein. Acting in behalf of the partnership, he was the title holder of 15,040 acres of mineral classified land in which the state had reserved the minerals. Acting under his powers as agent for the state under the Relinquishment Act, during 1929 he sold leases of these mineral classified lands to the Humble Oil & Refining Co. and received in consideration therefor the sum of $29,283.02. In his determination of the deficiencies in controversy, the respondent included in the income of each of the petitioners his or her community one half of a 90 percent interest in $29,283.02, which was received by the O–2 Ranch in 1929, or the sum of $13,177.36.

Clearly, under the decisions of the Supreme Court of Texas cited above, one half of this sum collected as bonus was the property of the State of Texas, and the respondent has included in the income of each petitioner the sum of $6,588.68, which was the property of the state.

It is earnestly argued by counsel for petitioners that this was erroneous, as the inclusion of the state's half of the bonus in their incomes and taxing it to them would be unconstitutional, as it would be taxing the income or property of the sovereign State of Texas. The petitioners do not deny the state's right to one half of the bonus

and it appears that W. W. Turney was active in securing the passage of an act of the Texas Legislature of 1933, Vernon's Annotated Texas Statutes, art. 5367a, which provides that payment may be made in cash, or if not able to pay in cash, payment may be made in 20 annual installments.

The Revenue Act of 1928, section 22 (b) (9), provides that " The following items shall not be included in gross income and shall be exempt from taxation under this title: * * * MISCELLANEOUS ITEMS.—The following items, to the extent provided in section 116: * * * Income of States, municipalities, and other political subdivisions."

Section 116 referred to provides in part: " In addition to the items specified in section 22 (b), the following items shall not be included in gross income and shall be exempt from taxation under this title: * * * (d) Income derived from any public utility or the exercise of any essential governmental function and accruing to any State, Territory, or the District of Columbia, or any political subdivision of a State or Territory, or income accruing to the Government of any possession of the United States, or any political subdivision thereof."

We conclude that, under the decisions of the Texas courts cited above, one half of the bonuses collected by petitioner W. W. Turney and the O–2 Ranch was the property of the State of Texas and that, under section 116 of the Revenue Act of 1928 and many decisions of the Federal courts it is nontaxable by the United States. Upon recomputation, the state's portion of the bonuses will be eliminated from petitioners' incomes.

In making his determination of the deficiencies respondent relied upon the case of *J. H. Tippett, Administrator*, 25 B.T.A. 69, decided by this Board January 4, 1932. That case is distinguishable from the instant case and is not applicable as an authority, as the facts and legal conditions were different. Tippett had collected large sums in bonuses on mineral classified lands, which he did not pay over to the state. In a suit by the state to which he was a party he denied the claim of the state and claimed to be the owner of the entire bonus. In support of his position he claimed that the Relinquishment Act did not authorize the construction put upon it in *Greene* v. *Robison, supra*, and that under an act known as Senate Bill 310, approved by the Governor of Texas on March 13, 1931, he was relieved of making payment of the bonus to the state, and it was further provided that no claim should be made by the state therefor.

In the case before this Board, Tippett contended to the contrary, viz., that the state was part owner of the bonuses. Our decision was based mainly on the Act of March 13, 1931, which relieved landowners of mineral classified lands of paying the state its part of the bonus. On February 24, 1932, the Supreme Court of Texas,

in *Empire Gas & Fuel Co.* v. *State*, 121 Tex. 138; 47 S.W. (2d) 265, in which case *Tippett* was a party, reaffirmed *Greene* v. *Robison, supra,* and in addition it held the Act of March 13, 1931, unconstitutional. There is no such act in force now, but, on the contrary, the Act of 1933 reasserts the rights of the state to its portion of the bonuses on mineral classified lands and provides for payment by the landowners.

It seems to us that, so far as this controversy is concerned, it is immaterial whether petitioners have paid the state its portion of the bonus or not. That question concerns the State of Texas and its agent only.

We have examined the other cases cited by respondent with care, but in none of them was the question of the right to tax property of a state involved and therefore they are not applicable.

Reviewed by the Board.

*Decision will be entered under Rule 50.*

VAN FOSSAN dissents.

---

BLACK, dissenting: I see no distinction in substance in the facts in the instant case from those which the Board had before it in *J. H. Tippett, Administrator,* 25 B.T.A. 69, and in which we held directly contrary to the conclusion reached in the majority opinion. It seems clear that in the instant case the lessor and the lessee were agreed that the *oil royalty* was to be paid equally to the State of Texas and to the partnership, the O-2 Ranch. One sixteenth of the oil produced under the terms of the lease was to be paid to the State of Texas and one sixteenth was to be paid to the O-2 Ranch. Of course the Commissioner is making no contention that the one sixteenth oil royalty paid to the State of Texas is taxable to anyone. It is exempt from taxation. As to the $29,283.02 bonus, it was all to be paid to the O-2 Ranch; it was in fact paid to the O-2 Ranch and the O-2 Ranch placed the funds in its own business, used them as its own, and, so far as the facts show, still has them there and has never paid over one penny of this $29,283.02 to the State of Texas.

The facts on this point are shown by the stipulation, as follows. Paragraph 7 of the stipulation says:

When the bonuses aggregating $29,283.02 referred to in paragraph (5) above, were paid to the O-2 Ranch, a partnership in 1929, the partnership took the money so received and used it generally in its business.

Again, in paragraph 9 of the stipulation, it is said:

Neither in taxable year 1929, nor at any time since, have petitioners or the O-2 Ranch, a partnership, paid over to the State of Texas, or any person or corporation, any portion of the bonuses aggregating $29,283.02 referred to in paragraph (5) of this stipulation.

Under these circumstances it seems clear to me that petitioners are taxable with their part of this bonus under the doctrine laid down by the Supreme Court in *North American Oil Consolidated* v. *Burnet*, 286 U.S. 417. The Supreme Court's decision in the latter case had not been made at the time we decided *J. H. Tippett, Administrator, supra*, but it seems to me it confirms the correctness of our decision in that case.

The Supreme Court in the *North American Oil Consolidated* case, laid down the rule as follows:

* * * If a taxpayer receives earnings under a claim of right and without restriction as to its disposition, he has received income which he is required to return, even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent. See *Board* v. *Commissioner of Internal Revenue*, (C. C. A.) 51 F. (2d) 73, 75, 76. Compare *United States* v. *S. S. White Dental Manufacturing Co.*, 274 U. S. 398, 403, 47 S. Ct. 598, 71 L. Ed. 1120. If in 1922 the government had prevailed, and the company had been obliged to refund the profits received in 1917, it would have been entitled to a deduction from the profits of 1922, not from those of any earlier year. Compare *Lucas* v. *American Code Co., supra*.

If the petitioners in this case ever pay over to the State of Texas any of this bonus payment, it will be soon enough then for them to take the deduction.

Having thus far paid none of it and during the taxable year involved having received it all and " used it generally in its business " (as agreed in the stipulation), it is taxable to petitioners, under *North American Oil Consolidated* v. *Burnet, supra*, and I think the majority opinion is erroneous in holding otherwise.